UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA         :
                                 :
     v.                          :     Case No. 3:17-cr-00072 (RNC)
                                 :
DENZIL STEWART                   :

RULING AND ORDER

Defendant Denzil Stewart is charged with possession of a firearm in furtherance of a drug trafficking crime and possession with intent to distribute cocaine. The firearm and cocaine were seized during a search of an apartment located on the second floor of a two-story, multi-family house at 90 Spring Street in West Haven. Mr. Stewart's girlfriend lived in the apartment, which was accessible by an exterior stairway. The search was conducted pursuant to a warrant issued by the Connecticut Superior Court. The warrant was obtained by members of a federal-state task force after a confidential informant made three controlled purchases of narcotics from a seller who was seen at 90 Spring Street in close temporal proximity to all three transactions.

Defendant has moved to suppress the fruits of the search on the grounds that (1) the affidavit submitted in support of the warrant application was (a) facially insufficient to establish the requisite nexus between the items sought and the apartment and (b) tainted by misstatements essential to the existence of

probable cause; and (2) the affidavit omitted to disclose that one of the two affiants, Bryan Kelly, was himself involved in illegal activity at the time, specifically, selling anabolic steroids, to which he pleaded guilty last year.[1]

An evidentiary hearing has been held at the defendant's request. At the hearing, testimony was provided by the second affiant on the warrant application, Special Agent Brian Ross of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). Ross testified that he believed drugs would be found in the second-floor apartment at 90 Spring Street based on the results of surveillance of that location in connection with the three controlled purchases. He further testified that the investigation of the defendant was in no way compromised by any misconduct on the part of Kelly. I credit Ross's testimony and deny the motion to suppress.[2]

---

[1] Defendant also raises concerns about whether the affidavit was sufficiently specific as to the identity of the suspect and adequately linked him to 90 Spring Street. However, as defendant concedes, the relevant question is whether the affidavit provided probable cause to search the property. See United States v. Martin, 426 F.3d 83, 87 (2d Cir. 2005) ("[W]e need not conclude that there was probable cause to arrest [the defendant]; we need only conclude that there was a fair probability that the premises to be searched contained contraband or evidence, fruits, or instrumentalities of a crime." (citing Zurcher v. Stanford Daily, 436 U.S. 547, 558-59 (1978))).

[2] In January 2019, defendant submitted several pro se filings related to the motion to suppress. See ECF Nos. 104, 110, 111. In February, defendant obtained new counsel. Defendant's new counsel filed a supplemental memorandum in support of the motion

2

I. Facts

In 2017, a confidential informant (CI) gave Ross the telephone number of a black male who was selling drugs out of a residence in West Haven. The CI had worked with Ross before and Ross had become the CI's "handler." The CI stated that the black male was known to carry a firearm and drive a rental car when conducting drug transactions. Ross proceeded to work with the CI to investigate the seller in West Haven and used the investigation as a training opportunity for other members of the task force.

At Ross's request, the CI called the drug contact number. A series of three controlled purchases soon followed, each one involving the CI and the defendant. On each occasion, the CI wore a wire transmitter so the transactions could be monitored by members of the task force. In addition to Ross, the task force included ATF Special Agents Michael Zeppieri, Sean

---

to suppress. ECF No. 118. Throughout this period, defendant has been represented. "A defendant has a right either to counsel or to proceed pro se . . . , but has no right to 'hybrid' representation, in which he is represented by counsel from time to time, but may slip into pro se mode for selected presentations." United States v. Rivernider, 828 F.3d 91, 108 (2d Cir. 2016). Accordingly, the Court need not consider pro se filings from represented defendants, though the Court has the discretion to do so. See id. at 108 n.5. Defendant's pro se arguments that were explicitly raised by his counsel in the supplemental memorandum are addressed herein. I will not comment further on defendant's other pro se arguments except to note that I have reviewed the arguments in detail and find them to be without merit.

3

Brackett, Michael Sorrentino and Mark Essing.  The task force also included two local police officers, one of whom was Kelly.

After the third controlled purchase, an application for a search warrant was prepared for the second-floor apartment at 90 Spring Street.  Kelly created the warrant application in a cut-and-paste manner from written reports that had been prepared by ATF Special Agent Brackett after each controlled purchase.  Kelly submitted his draft of the affidavit to Ross, who checked the draft for accuracy relying on Brackett's reports and his own recollection of events.  Both Kelly and Ross signed the affidavit on March 2, 2017.  Superior Court Judge Denise Markle issued the search warrant that day authorizing a search of the apartment for narcotics, narcotics-related items, and firearms.  Execution of the warrant led to the arrest of the defendant, who was present in the apartment along with his girlfriend.  The search resulted in the seizure of a loaded firearm, various quantities of narcotics, and a large sum of cash.

The warrant affidavit submitted to Judge Markle stated that probable cause existed to search the second-floor apartment at 90 Spring Street because it was being used in connection with the illegal possession and sale of narcotics.  In support of this conclusion, the affidavit summarized the three controlled purchases and provided the following information concerning the nexus between the purchases and the apartment.  After the first

controlled purchase, members of the task force saw the seller of the narcotics drive directly to an apartment building located at the corner of Spring Street and Front Avenue, where he parked in the driveway. This location was later identified as 90 Spring Street. After the second controlled purchase, the seller again drove directly to the same building at 90 Spring Street and parked in the driveway. Prior to the third controlled purchase, a surveillance team saw a blue SUV enter the driveway at 90 Spring Street and park. A man got out of the SUV and entered the second-floor apartment using the exterior stairway. About five minutes later, a Mazda was seen entering the driveway. A man exited the second-floor apartment, sat in the Mazda for a few minutes, then returned to the second-floor apartment as the driver of the Mazda drove away. Not long after that, a man exited the second-floor apartment, got into the blue SUV, and drove directly to the scene of the third controlled purchase, where he sold narcotics to the CI.[3]

The affidavit submitted to Judge Markle was accurate with

---

[3] The affidavit does not explicitly state that the same person parked the SUV, interacted with the driver of the Mazda, and later sold the drugs to the CI, but this is the most natural reading of the affidavit. Ross testified that it was the same individual. ECF No. 97 at 60, 63. Assuming Judge Markle interpreted the affidavit this way, the judge was not misled. Ross also testified that he believed at the time, and still believes, that the defendant is the person who sold drugs to the CI. Id. at 63.

the following relevant exceptions:

- Paragraph 14 of the affidavit states that in a telephone call preceding the second controlled purchase, the defendant instructed the CI to meet him at "Spring." The audiotape of this call shows that the defendant actually instructed the CI to meet him at "Front."
- Paragraph 16 of the affidavit states that in another call preceding the second transaction, the defendant stated he would need to pick up the heroin from his residence before delivering it to the CI. The audiotape shows that although the defendant said he would need to pick up the heroin, he said nothing about his residence.

Because these inaccuracies provide the primary basis for the defendant's motion to suppress, they will be discussed in detail below.

## II. Legal Standard

The Fourth Amendment protects individuals from "unreasonable searches and seizures" by government agents. U.S. Const. amend. IV. A search of a residence for evidence of criminal activity is presumptively unreasonable unless conducted pursuant to a warrant supported by probable cause to believe that the items sought will be found there. <u>United States v. Travisano</u>, 724 F.2d 341, 345 (2d Cir. 1983). In assessing probable cause for purposes of a search, a judge must consider

the information in the warrant application in "a practical, common-sense" manner and decide whether there is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983) (internal quotation marks omitted).

"[A] search pursuant to a warrant issued by a judicial officer upon a finding of probable cause is presumptively reasonable." Ganek v. Leibowitz, 874 F.3d 73, 81 (2d Cir. 2017) (citing Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991)). And a reviewing court must "accord considerable deference to the probable cause determination of the issuing magistrate." United States v. Thomas, 788 F.3d 345, 350 (2d Cir. 2015) (internal quotation marks omitted) (quoting Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007)); see also Travisano, 724 F.2d at 345 ("[T]he magistrate's finding of probable cause is entitled to substantial deference . . . . [and] is itself a substantial factor tending to uphold the validity of [a] warrant."). "[T]he task of a reviewing court is simply to ensure that the totality of the circumstances afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." Thomas, 788 F.3d at 350 (quoting Gates, 462 U.S. at 238). "[I]n close cases[,] . . . doubts should be resolved in favor of upholding the warrant." Travisano, 724 F.2d at 345.

7

The presumption of reasonableness that attaches to a search performed pursuant to a warrant "can be defeated by showing that [the government] (1) 'knowingly and deliberately, or with a reckless disregard of the truth,' procured the warrant, (2) based on 'false statements or material omissions,' that (3) 'were necessary to the finding of probable cause.'" Ganek, 874 F.3d at 81 (quoting Velardi v. Walsh, 40 F.3d 569, 573 (2d Cir. 1994)). "To determine whether a false statement was necessary to a finding of probable cause, we consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information." Id. (citing Soares v. Connecticut, 8 F.3d 917, 920 (2d Cir. 1993)).

If a search warrant is issued on the basis of an insufficient affidavit, suppression of evidence obtained in the search does not invariably follow. See United States v. Rosa, 626 F.3d 56, 64 (2d Cir. 2010) (citing Herring v. United States, 555 U.S. 135, 140 (2009)). "Exclusion of evidence is particularly inappropriate 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope . . . .'" United States v. Romain, 678 F. App'x 23, 25 (2d Cir. 2017) (quoting United States v. Leon, 468 U.S. 897, 920 (1984)). The Leon good-faith inquiry "'is confined to the objectively

8

ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" Herring, 555 U.S. at 145 (quoting Leon, 468 U.S. at 922 n.23). Thus, "[w]hen police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." Id. at 142 (quoting Leon, 468 U.S. at 922). An officer's reliance is not objectively reasonable, and therefore the good faith exception does not apply,

> in at least four circumstances: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable."

United States v. Raymonda, 780 F.3d 105, 118 (2d Cir. 2015) (quoting United States v. Clark, 638 F.3d 89, 100 (2d Cir. 2011)). "[T]hese limitations apply not merely in cases of deliberate police misconduct, but also in situations where an officer is 'reckless' or 'grossly negligent' in seeking or executing a warrant." Id. (citing Herring, 555 U.S. at 144).

III. Discussion

    A.  The Search Warrant Affidavit

The defendant first argues that the search warrant affidavit was facially insufficient to establish probable cause

9

to believe that evidence of illegal possession or sale of narcotics would be found in the second-floor apartment at 90 Spring Street. He points especially to the absence of information showing that he lived there. It is true that drug dealers often keep their supply at home. But the validity of the search in this case does not turn on whether the warrant affidavit supported a finding that the defendant lived in the apartment. Instead, the question here is whether the affidavit permitted a reasonable inference that narcotics likely would be found in the apartment. Applying the deferential standard of review required by the case law, I think it did. Even if the affidavit was arguably insufficient, the good faith exception applies.

Probable cause to search a location for contraband following a sale of narcotics may be established by observations of the seller going to the location immediately before or after the sale. See Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 3.7(d) nn.193-94 (5th ed. 2012 & Supp. 2018) (collecting cases). Here, the affidavit showed that the seller went directly to 90 Spring Street after the first two sales, and went to the second-floor apartment at 90 Spring Street before the third sale. In addition, surveillance of 90 Spring Street prior to the third sale revealed activity consistent with a sale of drugs out of the second-floor

apartment. These facts and circumstances, viewed in a common-sense manner, supported the agents' conclusion that narcotics likely would be found in the apartment. See, e.g., United States v. Dixon, 861 F. Supp. 2d 2, 5, 8-9 (D. Mass. 2012) (denying motion to suppress where affidavit described three controlled buys, after each of which officers followed the seller back to the address), aff'd, 787 F.3d 55 (1st Cir. 2015); cf. United States v. Mayweather, No. 17-CR-229, 2018 WL 3104254, at *3 (D. Minn. Jan. 19, 2018) (finding probable cause in part because "officers saw [defendant] return to [the] address after the controlled buy"), report and recommendation adopted, No. 17-CR-229, 2018 WL 1370532 (D. Minn. Mar. 16, 2018); United States v. Goldsberry, No. CR CCB-17-0143, 2017 WL 6025329, at *1 (D. Md. Dec. 4, 2017).

The defendant next argues that misstatements in the affidavit were essential to Judge Markle's finding of a nexus between the controlled purchases and the apartment. He points to the inaccuracies in the affidavit mentioned above -- the statement in paragraph 14 that in a recorded call preceding the second transaction the defendant told the CI to meet him at "Spring"; and the statement in paragraph 16 that the defendant told the CI in a subsequent recorded call he would need to pick up the heroin from his "residence." These statements do not provide a basis for invalidating the search unless the defendant

11

shows that they were made deliberately or with reckless disregard for the truth. Ganek, 874 F.3d at 81. No such showing has been made.[4]

At the hearing, Ross testified that the inaccuracies in the affidavit mirror errors in Brackett's written report concerning the second controlled purchase, which he and Kelly relied on in preparing the affidavit. With regard to the inaccuracy in paragraph 14, Ross testified that this was the product of a typo in Brackett's report. Crediting Ross's testimony, I find that Brackett mistakenly substituted "Spring" for "Front" in his report and that Ross and Kelly failed to detect the error when they relied on Brackett's report to prepare the affidavit. I further find that their failure to detect the error was not due to any desire to mislead. Ross credibly testified that when he overheard via the wire transmitter the conversation between the

---

[4] Defendant argues that the direction to "Front Avenue" is ambiguous and that it was the CI, not the defendant, who chose the location on Front Avenue where it intersects with Spring Street. This is indeed what the affidavit suggests. ECF No. 64-1 ¶ 16. However, the underlying recording is more nuanced: the defendant instructs the CI to meet him at "Front"; later, the CI indicates that he is at the intersection of Spring Street and another road that he cannot remember, and the defendant volunteers that the other road is "Front." Separately, the defendant emphasizes that the CI did not know the address of the residence associated with the defendant's sale of drugs. The CI's inability to provide this information was disclosed in the affidavit and, accordingly, the issuing judge was not misled on this point. Id. ¶ 3 (stating that the dealer "sells out of a residence in West Haven but the CI did not know the address").

12

defendant and the CI referred to in paragraph 14, he understood the defendant to be directing the CI to go to the corner of Spring Street and Front Avenue, and deployed surveillance accordingly. This explanation is consistent with paragraphs 15 through 19 of the affidavit, which state that the CI went to the corner of Spring Street and Front Avenue and waited for the defendant, who eventually arrived there to meet the CI and conduct the sale. Viewed in this context, I readily find that the inaccuracy in paragraph 14 was not made deliberately or with reckless disregard for the truth.

With regard to the inaccuracy in paragraph 16, Ross acknowledged that the defendant did not tell the CI he needed to go to his residence to pick up the heroin, as erroneously stated in Brackett's report of the pertinent call, and repeated in the affidavit. But Kelly, who was with the CI at the time of the call, interpreted the defendant's statement to the CI to mean that he had to stop at his house to get the drugs. The record shows that immediately after the call, Kelly notified the surveillance team that the defendant was "making it sound like he's got to go back to the house to grab" the heroin. After further conversation with the CI, Kelly again stated for the benefit of the surveillance team, "he told us he's going back to the house to grab it." In an ideal world, Brackett would have compared the recording of Kelly's report to the surveillance

13

team with the audiotape of the defendant's statement to the CI and clarified that the account of the call set forth in his report was based on Kelly's interpretation of the defendant's statement. But it was objectively reasonable for Kelly to infer from the defendant's statement that he had to stop at his house to get the heroin and there is no reason to think Brackett intended to create a false report. More to the point, there is no reason to think Kelly or Ross meant to mislead Judge Markle when they incorporated this part of Brackett's report into the affidavit. Accordingly, I find that the inaccuracy in paragraph 16 was not made deliberately or in reckless disregard of the truth.

The defendant has also failed to show, as he must, that these inaccuracies in the affidavit were essential to a finding of probable cause. Ganek, 874 F.3d at 81. Correcting the inaccuracy in paragraph 14 by replacing "Spring" with "Front" makes no difference to the existence of probable cause. The affidavit makes it clear that 90 Spring Street is adjacent to the intersection of "Front" and "Spring," so in this context "Front" and "Spring" mean much the same thing.[5]

---

[5] Defendant argues that the affidavit is misleading in its statement that 90 Spring Street is located at the corner of Spring and Front, because it is actually located next to the corner lot, which is vacant. ECF No. 64 at 3. A building next to a small vacant corner lot can be said to be on the corner, as defense counsel conceded at the hearing. ECF No. 97 at 94.

Correcting the inaccuracy in paragraph 16 by deleting the reference to the defendant's "residence" arguably detracts from the showing of probable cause because that reference helped support an inference that the defendant lived at 90 Spring Street. As previously discussed, however, the information in the affidavit concerning the seller's visits to Spring Street in close temporal proximity to the sales was sufficient to establish the requisite nexus between the sales and the second-floor apartment, whether or not the defendant lived there. Indeed, the affidavit identified 44 Clifton Street as "another possible address" for the defendant. ECF No. 64-1 ¶ 27.

In his post-hearing submissions, defendant also disputes the affidavit's implicit assertion that mobile surveillance of 90 Spring Street was feasible and proved to be effective. He claims that bushes surrounding 90 Spring Street "would make fleeting observations by persons driving by difficult if not impossible." ECF No. 118 at 1.[6] To support this claim, he offers images from Google Maps. Assuming arguendo that judicial

---

[6] Defense counsel limits the import of these points to arguing that it would be impossible for surveillance to observe "an alleged drug deal in the narrow driveway while driving by the residence," presumably referring to the apparent drug deal with a third party that allegedly occurred before the third controlled buy. ECF No. 118 at 1. Nevertheless, I consider the arguments as applied to all surveillance of 90 Spring Street, including the exterior stairway leading to the apartment on the second floor.

notice may be taken of the images, they do not undercut the validity of the affidavit. The images are dated August 2017, but the surveillance was conducted in February 2017. The bushes shown in the images do not appear to prevent observation of the house or the driveway. And the defendant previously conceded that the exterior stairway leading to the second-floor apartment was "easily visible." ECF No. 72 at 5.

The defendant argues that a discrepancy in the affidavit raises questions about the "accuracy of task force surveillance at" 90 Spring Street. Id. at 6; see also ECF No. 98 at 6. In this regard, he points out that, according to the affidavit, the defendant had a female passenger in the blue SUV when he arrived for the third transaction, yet the affidavit does not mention her entering the SUV while it was parked at 90 Spring Street. The defendant asks, "[i]f [the surveillance team] missed the fact that a passenger entered the SUV, how can they be sure Stewart was the person who entered and exited the second floor unit?" ECF No. 72 at 6-7. The defendant's question is beside the point because, as noted previously, the identity of the seller is not at issue on this motion. In any event, the affidavit's failure to mention the female passenger entering the SUV is not sufficiently concerning to warrant further inquiry.[7]

---

[7] Defendant also takes issue with Ross's testimony at the hearing that mobile surveillance of 90 Spring Street was necessary due

16

Because the inaccuracies in the affidavit were not made deliberately or recklessly, and because they were not essential to the finding of probable cause, the search warrant must be upheld. Moreover, even if the affidavit's showing of probable cause cannot survive deferential review, as the defendant contends, his attempt to invalidate the search still fails under the good faith exception. The affidavit was not so lacking in indicia of probable cause as to prevent a reasonable officer from relying on it. Nor does the record support a finding that the Superior Court was knowingly misled or that either affiant acted in bad faith.

B. Kelly's Involvement

Defendant next argues that Kelly's involvement in this case invalidates the search for essentially three reasons: the search warrant affidavit failed to disclose Kelly's own involvement in the illegal drug trade; other members of the task force might have purchased steroids from Kelly;[8] and Kelly's involvement in

---

to the densely populated nature of the surrounding area. He submits that in fact the area is not densely populated. The defendant's disagreement with Ross's characterization of the neighborhood does not cause me to doubt the credibility of Ross's testimony concerning the need to rely on mobile surveillance. Nor does it cause me to doubt the validity of the affidavit with regard to the results of the surveillance.

[8] Defendant relies on a press release issued by the U.S. Attorney's Office that states Kelly distributed steroids to "colleagues." D. Conn. U.S. Attorney's Office, Former Hamden Police Officer Pleads Guilty to Steroid Distribution Charge, Dep't of Justice (May 21, 2018), http://www.justice.gov/usao-

17

illicit activity casts doubt on the integrity of all aspects of the investigation. None of these reasons provides a basis for invalidating the search of the second-floor apartment at 90 Spring Street. Kelly's involvement in the illegal sale of steroids had no bearing on the existence of probable cause to search the apartment and thus did not have to be disclosed. The defendant's speculation that other members of the task force may have purchased steroids from Kelly was adequately refuted by Ross's testimony at the hearing that Kelly's involvement in illegal activity was unknown at the time. Even if one or more of the other agents bought steroids from Kelly without Ross's knowledge, that would also have no bearing on the existence of probable cause to search the apartment. Finally, Ross credibly testified that Kelly did not compromise the investigation in any way and the defendant has given me no reason to doubt Ross's testimony in this regard.[9]

---

ct/pr/former-hamden-police-officer-pleads-guilty-steroid-distribution-charge. The Court may take judicial notice of the press release.

[9] Defendant questions the results of the surveillance of 90 Spring Street on the ground that Kelly was involved in the surveillance. At the hearing, Ross testified extensively about the surveillance based on his personal knowledge and the records of the investigation. ECF No. 97 at 22, 37-38, 46, 51, 53, 57-58, 60. Defendant suggests that Kelly had a role in "selecting the target," but Ross testified that the investigation grew out of his own relationship with the CI. Id. at 6, 14. Defendant emphasizes that Kelly "searched the [CI] prior to and after buys," but Ross testified that standard procedure was followed with the CI at all times, he trusted the experienced CI, and on

The defendant has asked me to reopen the suppression hearing to enable him to question Kelly. ECF No. 98 at 1. When a defendant makes "a substantial preliminary showing" that an affiant included in the affidavit "a false statement knowingly and intentionally, or with reckless disregard for the truth," and "the allegedly false statement is necessary to the finding of probable cause," the Fourth Amendment requires that a hearing be conducted. Franks v. Delaware, 438 U.S. 154, 155-56 (1978). To satisfy this initial burden under Franks, the defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false." Id. at 171. If the defendant satisfies this burden, a hearing is not required unless the false statement is essential to the existence of probable cause. Id. at 171-72. As discussed above, the defendant has not identified any inaccuracies in the affidavit requiring a hearing. Because the defendant has not satisfied his initial burden under Franks, his request to reopen the hearing is

---

at least one occasion Special Agent Brackett performed the search prior to the buy. Id. at 14, 32-33, 53. Finally, defendant claims that the state court and now this Court must rely on Kelly's word "when discerning . . . if the contraband was what the government claims." ECF No. 72 at 3. But Ross testified that the items sold by the defendant tested positive for heroin and cocaine. ECF No. 97 at 28-29; 53-54; 65-66. The defendant provides no reason to doubt the reliability of Ross's testimony on any of these points.

denied.[10]

IV. Conclusion

Accordingly, the defendant's motion to suppress is denied.

So ordered this 9th day of May 2019.

                                          /s/ RNC
                                    Robert N. Chatigny
                                  United States District Judge

---

[10] Defendant has also moved for discovery of material related to Kelly. Under Federal Rule of Criminal Procedure 16, the government has a duty to disclose any document within its possession that is material to preparing the defense. While "the materiality standard of Rule 16 normally is not a heavy burden . . . , [t]he defendant must make a prima facie showing of materiality . . . ." United States v. Urena, 989 F. Supp. 2d 253, 261 (S.D.N.Y. 2013) (citations and internal quotation marks omitted). Defendant argues that "[t]he discovery requests related to Kelly are material, because [they] go[] to the reliability and accuracy of the information in the search warrant affidavit, which is the central issue in the motion to suppress." ECF No. 88 at 2. As just discussed, the defendant has not met his burden under Franks of identifying a material false statement in the affidavit that was made intentionally or recklessly. The defendant cites no case permitting discovery in these circumstances. At least one court outside this Circuit has held that a defendant may obtain discovery "on grounds short of those required under Franks for an evidentiary hearing." See LaFave, supra, § 4.4d & n.87 (citing People v. Luttenberger, 784 P.2d 633 (Cal. 1990)). Even assuming discovery into the accuracy of a search warrant affidavit can be obtained in such a way, the defendant is not entitled to engage in discovery without identifying a material false statement in the affidavit. Permitting him to do so would be contrary to the limits imposed by Franks on challenges to the accuracy of search warrant affidavits. As discussed in the text, the defendant provides no evidence casting doubt on the accuracy of a material statement in the affidavit. His motion for discovery is therefore denied.